## VERTURA MILLER v. HENRY HAMMERS, Appellant.

**Instruction:** HARMLESS ERROR. If it be true that a gift of liquor to an intoxicated person creates no liability in damages, a charge making one liable for "furnishing" liquor, is not prejudicial where it is conclusively shown that the liquor was sold, and where other instructions make selling an essential.

**Exemplary Damages** may be recovered under Code, 1557, if actual damages caused by selling liquor are shown. Willfulness and wanton disregard of the rights of others are not essential.

**Misconduct of Counsel.** Counsel said that certain witnesses testified as they did because they and defendants were Germans and old friends, and said, "the witnesses call it B. B., you and I know it was beer." *Held*, it might well have been omitted, but it is not cause for reversal.

*Appeal from Mills District Court.*—HON. A. B. THOR-NELL, Judge.

SATURDAY, FEBRUARY 9, 1895.

Action for damages for the alleged unlawful sale of intoxicating liquors. There was a trial by jury, and a verdict and judgment for plaintiff. Defendant appeals.—*Affirmed*.

*L. T. Genung, C. E. Dean,* and *Smith McPherson* for appellant.

*Shirley Gillilland* and *E. B. Woodruff* for appellee.

Rothrock, J.—I. The plaintiff is the widow of Andrew M. Miller, deceased, who came to his death on the eighteenth day of September, 1892, by falling out of a wagon while intoxicated. The claim is made in the petition that the appellant and other defendants in the action sold plaintiff's husband the intoxicating

liquors which produced his drunken condition, and that he was killed by reason thereof. She demanded damages because the death of her husband deprived her of her means of support. There were four defendants in all. The jury returned their verdict against three of them, and for the other. . The defendant Hammers is the only one which appeals.

It appears that the plaintiff's husband was a plasterer by occupation, and resided in the city of Glenwood. He owned a team of horses and a wagon. On the morning of the eighteenth day of September, 1892, he and some two or three others went into the country, in the wagon, to do some work. One of the men who was with him testified as a witness, in part, as follows: "I reside in Glenwood, and have lived there for about seventeen years. I was acquainted with A. M. Miller in his lifetime. He was a plasterer. He earned four dollars a day. I have seen him working quite a number of times. He lived across the railroad in Glenwood. Sometimes he laid brick. I recollect the circumstances of his death. I saw him on the south side of the square in Glenwood the day he was killed. He was going out beyond Mineola to work for a man whose name, I think, was Hansen. Going out to build a flue and do some plastering. I was engaged on the same piece of work with him. I went over to Mineola with him, in the same conveyance. We had no liquor with us that morning before going. We arrived at Mineola about ten o'clock. We there got some crackers and cheese. Went over to dry goods store and grocery. We took this lunch at the hotel in Mineola. We got our lunch that morning at the hotel. In the hotel there is a bar in one part. I think it is in the north. We took the lunch in the room where the bar was. We had some beer to drink there that morning. We took about three glasses apiece. I didn't get anything else

there. At that time there was Miller, Walling, Wall-
ing's boy, and myself. The boy's name was Hiram.
After we had lunch, a quart of whisky was ordered.
Mr. Walling got that. After that we went out and got
into the wagon, and started to go up to this man's,
where we were going to work; but in driving out of
town there was a plank, as we drove down town, ran
across the street there, part way, that the off fore wheel
struck, and threw the wheel under the wagon, and
stopped the team. and threw Mr. Walling off at the
same time. I then got off the wagon. I pulled Wall-
ing's knee back in, and carried him back to the hotel,
into the dining room, at the same hotel where we had
been. Mr. Miller and I first got a doctor. Miller and I
got into the wagon, and drove out to Hansen's. There
was a quart of whisky in there that went out to Hansen's.
It was about an hour after we got to the hotel that we
started for Hansen's. We did not drink any of the
whisky in the hotel. We drank some of the whisky
after we got out to Hansen's. We remained at Han-
sen's a couple of hours. We had a lunch there. With
our lunch we had some of the whisky. Then we came
back to Mineola. The whisky, or the balance of it, was
left at Hansen's. I could not say what portion of it
was left in the bottle. Miller drank some at Hansen's.
It was about the middle of the afternoon when we got
back to Mineola. This was September 19, 1892. We
went back to the hotel, where we got some more beer
to drink. After that we went upstairs where Walling
was. I was with Miller the whole of the afternoon.
After that we went across the street to Mr. Hammers'.
I recognize Mr. Hammers now in the court room. He
was the man I referred to when I say we went over to
Hammers' place. We got some beer there. Miller
drank some of it. Mr. Hammers sold us a couple of
bottles. Guess Hansen was also in there. Miller was

then getting pretty drunk. I don't remember of see-
ing the defendant Breemer there. I don't know
whether he was connected with the place of business
or not. We then went to another place where liquors
were sold, and Miller and I bought a drink. That was
a place above the dry goods store. Do not know whose
place it was. Cannot describe the man. That was
along in the evening. After we took this beer that
was sold by Henry Hammers, we drank a bottle. Mil-
ler was then pretty drunk. Miller was staggering
around. He could not control his movements. When
we started to go home, it was about sundown. Miller
tried to get liquor at some of these places afterwards,
and it was refused. I cannot tell, because I was get-
ting pretty full. I remember the circumstances. This
was just before we started for home. Miller was so
drunk that it took a second trial to get into the wagon.
After we got in, the team ran away with us. It was
Miller's team. Miller could not manage the team.
My condition was the same as Miller's. The team ran
seventy-five or one hundred yards. Miller was thrown
out over top of me, and thrown against the fence post;
striking with the top of his head, which caved his skull
in. He lived until three o'clock the next morning.
He didn't speak after he was thrown out. The doctor
took a stitch or two in the top of his head." Shirley
Gillilland, another witness for the plaintiff, testified
in substance to an admission made by appellant that
he had sold a certain drink, called "B. B.," to the
deceased, or to the party of men traveling in the
wagon. We have set out this testimony of the wit-
nesses for the reason that it is strenuously contended
that the verdict against the appellant was not author-
ized by the evidence. It is true that appellant testi-
fied that he did not furnish the party any intoxicating
liquor. He denied the conversation testified to by

Gillilland, and there was other evidence in corroboration of appellant, in his denial of having made such sale. There was a fair conflict in the evidence on this vital question in the case, and, under familiar rules, we are not authorized to interfere with the verdict.

II. The court, in the charge to the jury, directed them that the defendants were liable if they "sold or furnished" Miller intoxicating liquors that caused or contributed to his intoxication, and that such intoxication was the immediate cause of the accident resulting in his death. The question is made that the mere furnishing of the intoxicating liquors, without making a sale, was insufficient to authorize a recovery. All of the evidence in the case shows that whatever liquor was furnished was a sale, and not given away as by gift. And the jury were repeatedly told in the instructions that if the defendants sold the liquor they would be liable. There was therefore no prejudice in the use of the word "furnishing," even if the delivering of the drink was without the formality of a sale. All of the evidence shows that deceased was noticeably intoxicated at the time that he met the appellant. Under such circumstancs, it is questionable, to say the least, whether liability would not be incurred by a gift, the same as by a sale. See *Welch v. Jugenheimer*, 56 Iowa, 12, 8 N. W. Rep. 673.

III. Section 1557 of the Code provides that in cases like this the plaintiff may recover "for all damages actually sustained as well as exemplary damages." The court instructed the jury on the question of exemplary damages as follows: "If you should find that plaintiff is entitled to recover actual damages, she will be entitled to exemplary damages as well. Usually, exemplary damages are discretionary with the jury,—that is, the jury may

allow them or not, as they think best,—but under this statute under which this case is brought, if actual damages are given, exemplary damages must be added. But of the amount to be given you are the sole judges, keeping in view that exemplary damages are given as a punishment for the wrong done to plaintiff, and as an example that will prevent other persons from doing a like wrong in the future; and, in so doing, award such exemplary damages as, in your sound judgment and discretion, should be awarded. But exemplary damages cannot be awarded unless plaintiff has shown herself entitled to actual damages." The doctrine of this part of the charge is attacked because the question of the willfulness and wanton disregard of the rights of others is not, by the instructions, made necessary elements in the matter of allowing exemplary damages. The rule of the instructions is in exact line with the cases of *Fox v. Wunderlich*, 64 Iowa, 187, 20 N. W. Rep. 7, and *Thill v. Pohlman*, 76 Iowa, 638, 41 N. W. Rep. 385, and we are not disposed to change the rule.

IV. It is urged that one of the counsel for the plaintiff was guilty of such misconduct in the closing argument to the jury as to require a reversal of the judgment. Without setting out the language used by counsel in argument, we are content to say that, while it might well have been omitted, we do not think it was such misconduct as to warrant our interference with the verdict and judgment. We discover no ground for reversal and the judgment is *affirmed.*